UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CIVIL ACTION NO. 10-CV-344-JMH

MICHAEL STEPHEN LANCELLOTTI,  PLAINTIFF

VS:  **MEMORANDUM OPINION AND ORDER**

BUREAU OF PRISONS, et al.,  DEFENDANTS

\*\*\*\* \*\*\*\* \*\*\*\* \*\*\*\*

Plaintiff Michael Stephen Lancellotti is an individual in custody of the Federal Bureau of Prisons ("BOP"). While incarcerated at the Federal Medical Center in Lexington, Kentucky ("FMC-Lexington"), Lancellotti, proceeding without counsel, filed this civil rights action pursuant to the doctrine announced in *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), claiming that prison officials have been deliberately indifferent to his serious medical needs in violation of his Eighth Amendment rights.[1]  [R. 2]

On April 16, 2012, the Court screened the complaint and the construed amended complaint [R. 2, 11], dismissed all defendants except Warden Deborah A. Hickey, and issued summons to require Hickey to respond to Lancellotti's allegations. [R. 21]  Hickey has moved to dismiss the complaint, or in the alternative, for summary judgment. [R. 28]  The Court has entered an Order directing Lancellotti to file a response to Hickey's motion [R. 34], but he has not done so.  This matter is therefore ripe for decision.  The Court has reviewed the record and the submissions of the parties, and for the reasons stated below, will grant Hickey's motion and dismiss the complaint.

---

[1] On or about August 4, 2011, Lancellotti was transferred to the Federal Correctional Institution in Terminal Island, California.

**FACTUAL BACKGROUND**

On January 13, 1995, Lancellotti was convicted of (1) Maintaining a Place for the Purpose of Manufacturing and Distributing Methamphetamine, and (2) Use of a Firearm. He is serving a sentence of 300 months imprisonment. His current projected good conduct release date is October 3, 2015. [R. 28-3]

On February 13, 2008, Lancellotti underwent cervical spine surgery (anterior cervical vertebrectomy at C5) in Pomona, California, due to neurological symptoms associated with degenerative cervical disc disease which apparently resulted from Lancellotti's fall off of a roof in 1985. (BOP-0369)[2] This surgery did not completely resolve Lancellotti's cervical spine issues.

On or about June 30, 2009, Lancellotti was transferred from the Federal Correctional Center in Lompoc, California, to FMC-Lexington. After his transfer, he was scheduled for an offsite examination by a consultative neurosurgeon:

> **Reason for Request:**
> Please evaluate this 56 y/o man who was transferred from Lompoc, FCC. He had a fall from a roof top 23 yrs ago and has had progressive worsening of neurological symptoms. Had Anterior cervical vertebrectomy at C5 with failed hardwares on 02/13/2008. Recent X Rays revealed intervertebral body cage at C5 with forward displacement. Was seen by Neurosurgery in 11/14/2008, when cervical CT revealed that implant had been placed at C5 in incomplete vertebrectomy, partially filled with bone; a follow up MRI did not show significant compression of foraminal stenosis. The surgeon scheduled revision surgery, which was cancelled due to patient's poor cooperation and refusal of medications for his DM. Surgeon deemed this surgery as necessary, due to the high risk of anterior herniation, compromising peripheral N.S. or even life, for which he was rescheduled. The day of surgery, ths surgeon did not do the surgery due to patient's uncooperativeness towards him.
>
> **Provisional Diagnosis:**

---

[2] Hickey has submitted 37 exhibits, consisting of 1216 pages of Lancellotti's BOP medical records, under seal. These records are Bates-numbered "BOP-0001" through "BOP-1216." [R. 29, 30]

> S/P Anterior cervical vertebrectomy at C5 with failed hardwares, NIDDM, HTN, Hyperlipidemia.

(BOP-0369). Because Lancellotti's first cervical spinal surgery had been unsuccessful, a second surgery was scheduled after Lancellotti's transfer to FMC-Lexington.

On November 16, 2010, Lancellotti underwent a second cervical spine surgery at the University of Kentucky Medical Center ("UKMC"). [R. 28-4 at 4, ¶ 9] The surgical procedure performed was a cervical discectomy and fusion surgery with hardware removal and replacement. *Id.* Post-surgery, Lancellotti remained hospitalized at UKMC until November 22, 2010, when he was returned to FMC-Lexington. He received multiple follow-up evaluations by the UKMC neurosurgeon in 2010 and into 2011, and he experienced a normal, successful recovery from that neck surgery. *Id.*

Lancellotti claims that prison officials at FMC-Lexington were deliberately indifferent to his serious medical needs because his second surgery was performed at UKMC, and declined his request to have it performed at the Mayo Clinic in Rochester, Minnesota. As explained by Dr. Michael Growse, M.D., Clinical Director at FMC-Lexington, before Lancellotti was healthy enough to withstand the surgery, a host of other medical issues that required testing, monitoring, and treatment had to be resolved. In his declaration, Dr. Growse states:

> 1. I am currently employed as the Clinical Director at the Federal Medical Center in Lexington, Kentucky (hereinafter "FMC Lexington"). As Clinical Director, I oversee all clinical medical care provided to inmate patients at FMC Lexington. I have a Doctor of Medicine degree and I am a licensed physician. In addition to my supervisory duties, I also see patients and provide clinical medical care. I have reviewed the medical record of former FMC Lexington inmate Michael Lancellotti (hereinafter "Plaintiff"), register number 07146-097, on repeated occasions and I am familiar with his medical conditions and the treatment he received at FMC Lexington.

2.      Plaintiff was incarcerated at FMC Lexington from June 2009, through August 2011, when he was transferred to FCI Terminal Island. While at FMC-Lexington, he was diagnosed with a wide variety of serious medical problems, including aortic and valve stenosis, Type II diabetes, hypertension, chronic pain syndrome, hyperlipidemia, swallowing problems, obesity, mental health issues, and an unsuccessful cervical spine decompression and instrumentation surgery performed in 2008 before Plaintiff arrived at FMC Lexington. Plaintiff received extensive medical care for all of his medical conditions while at FMC Lexington.

3.      After Plaintiff arrived at FMC Lexington in June 2009, he was given a pre-surgical assessment in preparation for a possible revision of his previous 2008 cervical spine surgery. Plaintiff had originally injured his neck during a pre-incarceration fall from a building in 1985. During this examination, a previously undetected heart murmur was found, so Plaintiff was referred to a consultant cardiologist for evaluation, and a diagnostic echocardiogram was ordered.

4.      On October 22, 2009, the echocardiogram was performed, and it revealed severe valvular stenosis, mild valvular pulmomic stenosis, mild to moderate mitral stenosis, and moderate ventricular hypertrophy. On October 30, 2009, Plaintiff's condition was reviewed by a consultant cardiologist. The results of the echocardiogram were reviewed and discussed with Plaintiff. The cardiologist cleared Plaintiff for neck surgery.

5.      Plaintiff was evaluated by a consultant neurosurgeon for his neck condition on November 2, 2009. The neurosurgeon recommended Plaintiff receive a cervical Computerized Tomography (CT) study and a cervical Magnetic Resonance Imaging (MRI) study, in order to investigate possible instability of the neck. On November 24, 2009, the CT scan and MRI were conducted on Plaintiff, and a follow-up appointment with the neurosurgeon was scheduled.

6.      On February 22, 2010, Plaintiff's neck condition was re-evaluated by the neurosurgeon, and the results of the CT scan and MRI were discussed with Plaintiff. The physical examination revealed a relatively normal neurological examination. Cervical spine surgery was deemed to be elective and non-urgent in nature, because there was no evidence of any marked nerve impingement. The neurosurgeon noted that Plaintiff had concerns regarding difficulty in swallowing and talking. The neurosurgeon recommended Plaintiff receive a swallowing study and laryngeal examination be conducted prior to any cervical spine surgery being performed. Plaintiff's FMC Lexington primary care physician reviewed and approved the treatment recommendation of the neurosurgeon for the swallowing study and laryngeal examination.

7.      Plaintiff received care for his swallowing problems from FMC Lexington medical staff, including a licensed staff dietician who placed Plaintiff on a special

4

diet. Plaintiff subsequently received multiple swallowing studies and laryngeal examination.

8. Plaintiff's planned cervical spine surgery was further delayed because of serious concerns about his severe aortic stenosis, which had to be addressed by the cardiothoracic surgeon before Plaintiff could have the cervical spine surgery. On September 29, 2010, Plaintiff was seen by the consultant cardiothoracic surgeon for his severe aortic stenosis and related cardiovascular issues. The surgeon cleared Plaintiff for the cervical spine surgery, and recommended Plaintiff be reassessed for elective aortic valve surgery after his neck surgery.

9. With the clearance to proceed with the neck surgery, FMC Lexington staff scheduled Plaintiff's surgery. On November 16, 2010, Plaintiff received a successful cervical discectomy and fusion surgery with hardware removal and replacement on November 16, 2010, at the University of Kentucky ("UK") Medical Center. Plaintiff received multiple follow-up evaluations by the neurosurgeon in 2010 and into 2011, and recovered normally from the neck surgery.

10. In December 2010, Plaintiff was hospitalized and treated after failing a barium swallowing study. A cervical osteophytectomy (removal of bone spurs) was performed at UK Medical Center due to concerns about cervical bone spurs interfering with Plaintiff's swallowing. Plaintiff passed a modified barium swallow study in February 2011, and he was also under the care of a contract speech therapist.

11. During this period of time, Plaintiff refused surgery for his aortic valve condition. Plaintiff also voiced a desire to transfer to another institution. During his entire time at FMC Lexington, Plaintiff presented as a highly difficult patient who was often non-compliant with the treatment plans for his many medical problems, and often engaged in manipulative behavior to attempt to obtain his desired goals. His primary physician at FMC Lexington noted that Plaintiff had feelings of being persecuted and at times even voiced irrational beliefs that staff was trying "experiment[s]" on him for profit. Despite having many serious medical issues, including his aortic and valvular heart problems and swallowing issues which required further medical investigation and legitimately delayed his neck surgery, Plaintiff had difficulty accepting these facts.

12. Plaintiff was cleared for transfer to FCI Terminal Island, which is a medical facility with a medical mission to care for inmates who require specialized or long-term medical care. On August 4, 2001 [sic], Plaintiff left FMC Lexington en route to FCI Terminal Island.

[R. 28-4 at 1-5]

## APPLICABLE LAW

5

*Standards for Dismissal/Summary Judgment*

Fed. R. Civ. P. 12(b) provides for the dismissal of claims and parties for seven listed reasons. Subsection (b)(6) provides for dismissal for failure to state a claim upon which relief can be granted. Thereafter, Rule 12 continues, in subsection (d), as follows:

> **(d)** **Result of Presenting Matters Outside the Pleadings.** If, on a motion under Rule 12(b) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties shall be given reasonable opportunity to present all material made pertinent to the motion.

*Id.* Thus, the plain language of Rule 12(d) requires a Rule 12(b)(6) motion to be converted into a motion for summary judgment where the moving party invites consideration of materials extrinsic to the complaint as grounds for dismissal. Because Warden Hickey has submitted her own declaration and that of Dr. Growse, as well as 1200 pages of Lancellotti's medical records, in support of her motion, the Court will apply the standard applicable to motions for summary judgment under Rule 56.

In determining a motion for summary judgment, the Court must determine whether there are "no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has directed that a court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The significant question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-53, (1986). The moving party has the burden of showing there is an absence of evidence to support a claim. *Celotex*, 477 U.S. at 324-25. After a moving party carries

its burden, the non-moving party must go beyond the pleadings to designate by affidavits, depositions, answers to interrogatories, and admissions on file, specific facts showing that there is a genuine issue of material fact for trial. *Id.* With these standards in mind, the Court examines the defendant's motion.

*Eighth Amendment Standards*

The Supreme Court has held that "[i]n order to state a cognizable claim [under the Eighth Amendment with regard to medical care] a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to the plaintiff's serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Therefore, a prisoner must show both "deliberate indifference" and "serious medical needs." *Id*. "Deliberate indifference" means that prison medical staff knew of the inmate's serious medical needs, but intentionally disregarded an excessive risk of harm to the inmate, or that prison guards or medical staff intentionally prevented the inmate from receiving prescribed treatment or intentionally delayed or denied him access to medical care. *Estelle*, 429 U.S. at 104-105; *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Thus, the Eighth Amendment contains both an objective and a subjective component. *Wilson v. Seiter*, 501 U.S. 294 (1991). The objective component requires the existence of a "sufficiently serious medical need." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id*. at 897. The subjective component requires a plaintiff to show that "the official [knew] of and disregard[ed] an excessive risk to inmate health or safety, which is to say the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious

7

harm exists, and he must also draw the inference." *Clark-Murphy v. Foreback*, 439 F.3d 280, 286 (6th Cir. 2006). Deliberate indifference may be "manifested by prison doctors in their response to a prisoner's needs or by prison [staff] in intentionally denying or delaying access to medical care or intentionally interfering with treatment once prescribed." *Estelle*, 429 U.S. at 104.

However, no claim of a constitutional dimension is stated where a prisoner challenges only matters of medical judgment or otherwise expresses a mere difference of opinion concerning an appropriate course of treatment. *Sharpe v. Patton*, No. 08-cv-58-HRW, 2010 WL 227702, at *10-11 (E.D. Ky. Jan. 19, 2010). When the cause of action is based on an allegation that the prescribed treatment was inadequate in some way, rather than on an allegation that the prison official failed to provide the plaintiff with any treatment, courts traditionally have been reluctant to second guess the medical official. *Rodriguez v. Lappin*, No. 08-cv-347-GFVT, 2009 WL 2969510, at *5-6 (E.D. Ky. Sept. 11, 2009). Simply put, differences of opinion as to matters of medical judgment, negligent treatment, or even medical malpractice are insufficient to establish that one has received inadequate medical care in violation of the Eighth Amendment. *See, e.g., Greer v. Daley*, No. 01-C-586-C, 2001 WL 34377922, at *3 (W.D. Wis. Dec. 27, 2001). In *Greer*, some of the inmate's physicians requested surgery to correct a deviated septum, but that request was denied by other physicians, including the Medical Director, based on their medical opinion that surgery was unnecessary. The court in *Greer* held that the dispute among medical professionals concerning the inmate's need for the surgery in question does not rise to the level of an Eighth Amendment claim for inadequate medical care.

Further, the law is clear that a prisoner fails to state a claim when he disagrees with the exhaustive testing, consultations, and treatment he received while incarcerated. *Lyons v. Brandly*,

430 F. App'x 377, 379-81 (6th Cir. 2011). It is well-settled that "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law." *Graham ex rel. Estate of Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004) (*quoting Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)). The Eighth Amendment does not require that every request for medical care by an inmate or specific type of care be honored. *Fitzke v. Shappell,* 468 F.2d 1072, 1076 (6th Cir. 1972); *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). "Because the plaintiff received medical attention, and his dispute is over the timing and adequacy of that treatment, the Court will not second-guess medical judgments or constitutionalize these state tort claims." *Dotson v. Wilkinson*, 477 F. Supp. 2d 838, 849 (N.D. Ohio 2007) (delay in placing plaintiff in Hepatitis C program did not rise to deliberate indifference when plaintiff's high blood pressure and creatinine levels excluded him from candidacy). *See also Westlake*, 537 F.2d at 860; *Shofner v. Comacho*, 230 F.3d 1359 (6th Cir. 2000).

## ANALYSIS

The voluminous medical records provided by the BOP establish that prison medical staff have provided Lancellotti with an abundance of medical care to treat his numerous medical conditions, the antithesis of deliberate indifference to his medical needs. Upon arriving at FMC-Lexington in June 2009, Health Services staff performed an initial health screening, and Dr. Morales conducted a physical examination. As a result, Lancellotti was given a provisional diagnosis of "S/P Anterior cervical vertebrectomy at C5 with failed hardwares, NIDDM, HTN, Hyperlipidemia." (BOP-0369). Dr. Morales noted that before he arrived at FMC-Lexington, Lancellotti had been scheduled for revision surgery to correct the problems associated with the 2008 cervical spine

surgery, but that the surgery had been cancelled. Dr. Morales therefore requested an offsite neurosurgery consultation for Lancellotti. *Id.*

Dr. Growse indicates that Lancellotti underwent a pre-surgical assessment shortly after his arrival at FMC-Lexington. [R. 28-4 at 2; BOP 0219-28; BOP 0241-55] During this assessment, staff detected a previously unknown heart murmur, necessitating a cardiology consult, echocardiogram, and clearance before surgery could proceed. [R. 28-4 at 2 ¶ 3; BOP 0146; BOP 0180-85; BOP 0187-89; BOP 352-54, BOP 0370; BOP 0564-65; BOP 0583-90; BOP 0848; BOP 0849] Lancellotti also had severe difficulty swallowing, which required further medical intervention prior to his neck surgery. [R. 28-4 at 2-3, ¶¶5-7; BOP 0130-33; BOP 0336-37; BOP 0737-38; BOP 0873-74] Lancellotti's surgery was also delayed because of serious concerns about his severe aortic stenosis, which required consultation by the cardiothoracic surgeon. [R. 28-4 at 3-4, ¶8; BOP 0564; BOP 0849].

While physicians were working to address these medical concerns so that he could undergo surgery safely, Lancellotti continued to complain of his treatment and demand that he either have the surgery at once or be transferred immediately. [BOP 0542] However, on October 26, 2010, the same date Lancellotti requested a transfer "if I am not going to get the surgery," BOP medical records reflect that his surgery had already been scheduled and that transfer was not indicated at that time. [BOP 0541-42] Dr. Carr noted: "Patient very frustrated by the delay,…the date is set." *Id.* Approximately two weeks later, Lancellotti underwent a successful cervical surgery. [R. 28-4 at 4 ¶9; BOP 0778-83; BOP 0813-16] He also underwent a second surgery to remove bone spurs in December 2010 to correct swallowing problems. [R. 28-4 at 4 ¶10; BOP 0457-58; BOP 0758-63]

10

During this period, Lancellotti refused surgery for his aortic valve condition. [R. 28-4 at 4-5 ¶11; BOP 0731-32]

Lancellotti's medical records establish that the medical staff at FMC-Lexington provided Lancellotti with extensive and adequate medical care not only with respect to his cervical spine surgery, but also for numerous related medical conditions. [R. 28-4 at 1-5, ¶¶ 2-11] Lancellotti's neck surgery was legitimately delayed because serious aortic and valvular heart problems were discovered and needed further medical investigation, along with his swallowing issues. [R. 28-4 at 2-4, ¶¶ 3-9; BOP 0564; BOP 0583; BOP 0590] Medical staff performed the neck surgery Lancellotti needed promptly after he cleared medical conditions, and the surgery was successful. [R. 28-4 at 4 ¶ 9; BOP 0778-83] Lancellotti refused surgery for his aortic condition. [R. 28-4 at 4-5, ¶¶ 11-12; BOP 0731-32; BOP 1211] The foregoing facts clearly establish that medical staff, both those employed directly FMC-Lexington and outside medical consultants, provided Lancellotti with extensive and competent medical care which was appropriate and fully consistent with constitutional standards.

Lancellotti has also failed to demonstrate that Warden Hickey was in any way personally involved in decisions regarding his health care. Hickey indicates that she served as the Chief Executive Officer of FMC-Lexington and the custodian of inmates incarcerated there, including Lancellotti, from July 2009 through May 2012. [R. 28-5 at 1 ¶1] As warden, Hickey was the head of numerous departments at the institution, including the Health Services Department, which provided medical services to Lancellotti and other FMC-Lexington inmates. [R. 28-5 at 1-2, ¶2] However, Hickey delegated all responsibility for the clinical medical care of Lancellotti to her staff

11

in the Health Services Department, and she had no direct involvement with any medical decisions or care for Lancellotti. [R. 28-5 at 2, ¶3]

These facts establish that Lancellotti cannot state a viable Eighth Amendment claim against Warden Hickey arising out of his medical care. A plaintiff must demonstrate that the defendant "possessed a sufficiently culpable state of mind in denying the medical care." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 (6th Cir. 2005) (*quoting Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004)). Liability for violating a person's civil rights must be predicated upon a defendant's personal actions. *Hicks v. Dewalt*, No. 07-CV-335-KSF, 2008 WL 2859031, at *4 (E.D. Ky. July 24, 2008). The plaintiff must describe how each individual defendant acted personally to deprive the plaintiff of his constitutional rights. *Rizzo v. Goode*, 423 U.S. 362 (1976). Bare-boned, conclusory allegations that a defendant personally deprived plaintiff of constitutional or statutory rights are insufficient. *Hall v. United States*, 704 F.2d 246, 251 (6th Cir. 1983).

In this case, Lancellotti has failed to articulate how Defendant Hickey was personally involved in his medical care. In fact, Warden Hickey indicates that she had no direct involvement with any medical care or decisions related to Lancellotti. [R. 28-5 at 2, ¶3] Moreover, non-medical personnel are not "deliberately indifferent" simply because they did not personally respond to medical complaints from a prisoner who was already under the care of the medical professionals. *Harrison v. Ash*, 539 F.3d 510, 518-20 (6th Cir. 2008); *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004). Warden Hickey's position as the prison administrator simply does not "justify any inference of personal involvement in the alleged deprivation of medical care." *Williams v. Faulkner*, 837 F.2d 304, 308 (7th Cir. 1988).

Nor can Warden Hickey be held legally accountable for constitutional torts committed by others merely because she has supervisory responsibility over them. *Polk County v. Dodson*, 454 U.S. 312 (1981). Instead, liability must be premised on direct or personal involvement of the named defendant. *Winkelman v. Doe*, No. 07-cv-98-GFVT, 2007 WL 2251893, at *3 (E.D. Ky. Aug. 7, 2007) (*citing Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1246 (6th Cir.1989) and *Hays v. Jefferson County, Ky.*, 668 F.2d 869, 872 (6th Cir. 1982)). Here, Lancellotti has failed to allege facts indicating that Warden Hickey was somehow personally involved in making medical decisions regarding his care, an involvement negatived by both Hickey's own declaration and the extensive medical records filed by the BOP. Because Hickey was neither personally involved in Lancellotti's care nor vicariously liable for the care provided by others, the Eighth Amendment claims against her fail as a matter of law. *Rizzo*, 423 U.S. 362.

Accordingly, **IT IS ORDERED** that:

1. The Defendant's motion for summary judgment [R. 28] is **GRANTED.**

2. Lancellotti's complaint and construed amended complaint [R. 2, 11] are **DISMISSED WITH PREJUDICE.**

3. The Court will enter an appropriate judgment.

4. This matter is **STRICKEN** from the active docket.

This the 30th day of August, 2012



Signed By:
*Joseph M. Hood*
Senior U.S. District Judge